FILED
United States Court of Appeals
Tenth Circuit

December 16, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JULIUS RECARDO YOUNG,

      Petitioner-Appellant,

v.

MARTY SIRMONS, Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee.

No. 07-5130

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. CV-00-310-P)**

---

Steven M. Presson of Presson Law Office, Norman, Oklahoma, for Petitioner-Appellant.

Seth S. Branham, Assistant Attorney General (W. A. Drew Edmondson, Attorney General, with him on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **HENRY**, Chief Judge, **BRISCOE,** and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

      In 1995, Julius Recardo Young was convicted in Oklahoma state court of two

counts of first degree murder for beating to death a six-year old child and the child's

mother. Young was sentenced to death for these murders. He appeals the district court's

denial of his 28 U.S.C. § 2254 habeas petition. We exercise jurisdiction pursuant to 28

U.S.C. § 1291 and affirm.

I.

*Factual background*

The relevant underlying facts of this case were outlined in detail by the Oklahoma

Court of Criminal Appeals (OCCA) in addressing Young's direct appeal:

> Julius Recardo Young was convicted of murdering his girlfriend's daughter and six year old grandson. The murders occurred two days after his girlfriend, Joyslon Edwards, advised him she wanted to cool their relationship, and he would not get a key to her new apartment. She was not giving him a key, because she wanted her daughter and grandson to "feel safe" when they visited her. They did not like Young. Young had a key to the apartment Edwards had been sharing with her daughter, Joyland Morgan, and her grandson, Kewan Morgan. The day before the murders Edwards demanded the key from Young, but he did not return it.
>
> Joyland and Kewan Morgan were beaten to death in their Tulsa apartment on October 1, 1993. Their wounds indicated the murder weapon was a blunt instrument similar to a baseball bat, but the murder weapon was never found. Ms. Morgan sustained defensive wounds to her hands and arms, and at least thirteen blows to her face and head. These blows broke her jaw, tore open her scalp, and fractured her skull. She was found slumped against a living room wall. Kewan Morgan died in his bed. He sustained massive head fractures caused by two separate blows.
>
> Every night before she went to bed Joyland Morgan secured her front door with two locks and a security chain. The intruder opened both locks with a key and pushed through the security chain, breaking it. A piece of the broken chain was missing from the apartment.
>
> No eye-witnesses were found. However, a downstairs neighbor was awakened at 3:40 a.m. by a single loud bump from Morgan's apartment. Joyslon Edwards testified she saw a baseball bat in Young's trunk the night before the murders, but the next day it was gone.

2

Young always drove Edwards to work and the day of the murders he arrived at 4:15 a.m., earlier than usual. Edwards asked him for change so she could use the vending machines at work. When Young pulled out the contents of his pocket, Edwards saw a piece of security chain similar to the one she had installed on her daughter's door. Later that day when Edwards learned of the murders, she reported this evidence to the police.

Young lived with his mother at the time, and the police obtained a warrant to search the mother's home. Edwards told them what Young had worn the previous evening. The police recovered the shoes described by Edwards and these bore a visible spot of blood. Young accompanied the police during the search. He volunteered the drop was fish blood. DNA testing revealed the drop was human blood consistent with that of Joyland and Kewan Morgan. The police also recovered a freshly laundered shirt which tested positive for blood when it was exposed to luminal [sic].

Young v. State, 992 P.2d 332, 336-37 (Okla. Crim. App. 1998) (Young I) (internal paragraph numbers omitted).

*State court proceedings*

On February 22, 1994, Young was charged by information in the District Court of Tulsa County, Oklahoma, with two counts of first degree murder (under alternative theories of malice aforethought and felony murder) and one count of first degree burglary. On May 5, 1994, the State filed a bill of particulars asserting that Young should be punished by death for the murder offenses "due to and as a result of" four aggravating circumstances: (1) "The defendant knowingly created a great risk of death to more than one person"; (2) "The murder was especially heinous, atrocious, or cruel"; (3) "The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution"; and (4) "The existence of a probability that the defendant would commit

3

criminal acts of violence that would constitute a continuing threat to society."[1]  State

Court ROA, Vol. I at 41.

On June 17, 1994, Young's counsel presented to the state trial court, during a

motions hearing, a pleading entitled "Application for Psychological Evaluation and

Permission to Interview Defendant."[2]  Id. at 70; Tr. of Jun. 17, 1994 Motion Hearing at

14.  The pleading sought authorization from the state trial court to allow two licensed

professional counselors[3] to interview Young and conduct a psychological evaluation.  As

a basis for the request, the pleading stated that "[i]t [wa]s necessary, due to the very

nature of this case, that the Defendant be evaluated prior to the time of trial."  State Court

ROA, Vol. I at 70.  When asked by the state trial court during the hearing what the

purpose of the requested evaluation was, Young's counsel stated that it was not for

purposes of developing an insanity defense, but rather "to make certain that the defendant

is psychologically and mentally stable at this point in time of the proceedings and at some

point in time it may be necessary even for mitigation or defense in the fact that he didn't

---

[1] The bill of particulars did not identify to which of the two murders the second and third alleged aggravating circumstances were referring.  The prosecution subsequently filed a "notice of evidence in aggravation of punishment" that indicated the "heinous, atrocious or cruel" aggravator referred to the murder of Joyland, and that the "avoiding or preventing lawful arrest or prosecution" aggravator referred to the murder of Kewan.  State Court ROA, Vol. I at 73-74.

[2] According to the state court record, Young's trial counsel did not formally file the application with the clerk of the court until August 5, 1994.

[3] The two counselors named in the pleading were "Linda Palmer, MS, LPC, LMFT and Sandra Caster, MS, LPC," both of Tulsa, Oklahoma.  State Court ROA, Vol. I at 70.

fit the personality to do the same." Tr. of Jun. 17, 1994 Motion Hearing at 15. The state trial court denied the motion "as being premature . . . ." Id.

On September 21, 1994, Young filed a "Notice of Mitigation in the Event of Conviction" that listed nine witnesses who would testify in mitigation in the event Young was convicted of one or both murders. State Court ROA, Vol. I at 83. The notice further stated that, "in the event of a conviction," "[e]vidence w[ould] be introduced as a matter of law to generalities and specifics of the good person that Julius Young ha[d] been." Id. at 84. On September 30, 1994, Young filed a "Supplement to Notice of Mitigation in the Event of Conviction" stating that, of the nine witnesses listed in the original notice, the first seven would "testify substantially as to generally the good things that [Young] ha[d] done and their belief concerning that he [wa]s not a future danger to the community, along with past good deeds." Id. at 85. The Supplement further indicated that the eighth and ninth witnesses listed in the original "Notice," i.e. the two licensed professional counselors that were originally listed in Young's application for psychological evaluation, would testify regarding the results of psychological testing on Young. Id. According to the state court record, however, Young's counsel never renewed their application for psychological evaluation. Thus, the two licensed professional counselors listed as witnesses in the Supplement to Notice of Mitigation never interviewed or evaluated Young.

The case proceeded to trial on September 5, 1995. At the conclusion of the first-stage proceedings, the jury found Young guilty of two counts of first degree malice

5

aforethought murder (Counts I and II of the information) and one count of first degree burglary (Count III). At that time, the prosecution filed a notice of intent to offer evidence in rebuttal of any mitigating evidence that Young might present. State Court ROA, Vol. III at 435.

The second-stage proceedings occurred the following day, September 21, 1995. During the second-stage proceedings, the prosecution incorporated by reference all of the first-stage evidence. In addition, the prosecution presented victim impact testimony from a relative of the two victims. Young elected not to testify in his own behalf or present any mitigation witnesses. In light of Young's decision in this regard, Young's counsel entered into a stipulation with the prosecution, which was read to the jury, that Young was "42 years of age and . . . ha[d] been a life-long resident of Tulsa," "ha[d] family, relatives that love[d] him," "ha[d] been a minister in a church for 11 years," and was "a veteran, having served in the U.S. Army and was honorably discharged." ROA, Tr. Vol. III at 918-19. At the conclusion of the second-stage proceedings, the jury found the existence of three aggravating circumstances (that Young knowingly created a great risk of death to more than one person; the murder was especially heinous, atrocious or cruel[4]; and the existence of a probability that Young would commit criminal acts of violence that

_____

[4] Consistent with the bill of particulars, the jury's verdict form did not specify which of the two murders this aggravating circumstance pertained to. Although the prosecution had filed a "notice of evidence in aggravation of punishment" indicating that this aggravating circumstance related only to the murder of Joyland, "[a]t trial the prosecutor ignored this self-imposed limitation and argued each aggravating circumstance as to each murder count." Young I, 992 P.2d at 343.

6

would constitute a continuing threat to society) and fixed Young's punishment at death for the two murder convictions. As for the burglary conviction, the jury fixed Young's punishment at fifty years' imprisonment.

The state district court conducted sentencing proceedings on September 28 and October 4, 1995. During the September 28th proceeding, Young's counsel asked the state district court to sentence Young to life imprisonment without the possibility of parole. In support of this request, Young's lead counsel, Jim Fransein, asserted that he had planned to introduce witnesses and evidence in mitigation during the second-stage proceedings, but that the mitigation witnesses "had been advised without [his] permission, [his] request or [his] recommendation not to appear," and that Young likewise had determined not to take the stand in his own defense. ROA, Tr., Vol. III at 937. In response to this request, the prosecution noted that it had agreed, after Young's counsel learned that Young would not be testifying or presenting any mitigation witnesses, to stipulate regarding certain mitigating evidence. Young himself addressed the state district court and asserted his factual innocence of the crimes. Young did not, however, offer any explanation for his decision to forego mitigation testimony. During the October 4th proceeding, the state district court imposed the sentences fixed by the jury.

*Young's direct appeal and state post-conviction proceedings*

Young filed a direct appeal challenging his convictions and sentences. On November 6, 1998, the OCCA affirmed Young's convictions and sentences. Young I, 992 P.2d at 336, 348. Young filed a petition for rehearing asserting that the OCCA failed

7

to consider his request for an evidentiary hearing on his claim of ineffective assistance of trial counsel. On February 19, 1999, the OCCA granted Young's petition for rehearing and, on the merits, denied his request for an evidentiary hearing. Young filed a petition for writ of certiorari with the United States Supreme Court. That petition was denied by the Supreme Court on October 4, 1999. Young v. Oklahoma, 528 U.S. 837 (2001).

While his direct appeal was still pending before the OCCA, Young, in accordance with Oklahoma procedural rules, filed an application for post-conviction relief with the OCCA. Young's application alleged, in pertinent part, that he was denied the effective assistance of trial counsel. In support of that claim, Young submitted "the affidavits of a mitigation expert, Dr. Wanda Draper, . . . and a mental health expert, Dr. Philip J. Murphy." App. for Post-Conviction Relief at 14. The OCCA denied the application for post-conviction relief on April 28, 1999, in an unpublished opinion. Young v. State, No. PC-97-884 (Okla. Crim. App. Apr. 28, 1999) (Young II).

*Young's federal habeas proceedings*

On April 17, 2000, Young initiated this federal habeas action by filing a pro se motion to proceed in forma pauperis and a motion for appointment of counsel. Young's motion for appointment of counsel was granted and, on October 3, 2000, Young filed a preliminary petition for writ of habeas corpus asserting eighteen tentative grounds for relief. On December 4, 2000, Young filed an amended petition asserting only seven grounds for relief.

On September 23, 2005, the district court issued an opinion and order denying

8

Young's petition. The district court subsequently granted a certificate of appealability (COA) with respect to four issues: (1) ineffective assistance of trial counsel for failing to adequately investigate and present mitigation evidence during the second-stage proceedings; (2) improper victim impact evidence; (3) improper admission of Young's "fish blood" statement; and (4) cumulative error. On appeal, Young has abandoned his challenge to the admission of his "fish blood" statement, but continues to pursue the remaining three issues.

## II.

Our review of Young's appeal is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by the state courts. Id.

If a claim was addressed on the merits by the state courts, we may not grant federal habeas relief on the basis of that claim unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be

9

convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow, 474 F.3d at 696 (internal citation and quotation marks omitted).

If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, our standard of review is more searching. That is, because § 2254(d)'s deferential standards of review do not apply in such circumstances, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error. McLuckie, 337 F.3d at 1197.

III.

*Introduction of victim-impact evidence*

Young contends that the introduction of victim impact evidence during the second-stage proceedings violated his rights under the Eighth and Fourteenth Amendments. This evidence came in the form of testimony from Catherine Morgan, the maternal aunt of Joyland. Morgan testified that she was selected by members of the victims' family to prepare a victim impact statement for the trial court. ROA, Tr., Vol. III at 913. At the request of the prosecution, Morgan read her statement into the record:

> The tragic [sic] of Joyland and Kewan's death affected more than 55 members. The effect on the family was devastating, shocking, hurt and anger as to why this happened.
> Each family member was affected by this differently. Some were very emotionally upset, some had to be strong for others and for Lavada Grant, the aunt of Joyland and Kewan, she had a heart attack and died the night of the murders.

10

James Ella, Joyland and Kewan's grandmother, had some health problems with her nerves, sleepless nights, crying and worrying. She did the best to be strong for other family members, but of her closeness with Joyland and Kewan, this was very difficult at the time.

Joyland and James Ella were very close. Joyland would come into James Ella's room and lay across the foot of her bed and share her thoughts and feelings about things.

They would talk about Joyland's goal for her life. James Ella would offer Joyland advice as grandmothers and granddaughters would do. James Ella now misses those sharing times.

Kewan was James Ella's little boy. He spent a great deal of time with her. Kewan would look forward to Friday evenings to go spend with grandma. He would pack his little blue overnight case and stand in the doorway for her to pick him up. He would say, 'I wait on maw-maw'.

They would start the weekend singing, playing and laughing. Kewan was always ready to go to church with grandma so he could sing and clap his hands with the choir.

Joyslon Edwards, the mother of Joyland and the grandmother of Kewan, was affected by hurt, guilt, anger and shock. The first year after Joyland and Kewan's death, Joyslon was unable to work at the daycare center where Kewan once attended.

Caring for the kids was a constant reminder of things her and Kewan [did] in the day care. Additionally, Joyland helped to decorate her class room at the center. Joyslon would think of things and begin to cry and the children wanted to know what's wrong with Miss Joy and asked questions about Kewan so for the best interest of the children she took a leave of absence.

Joyslon wasn't able to sleep at night, she would always see their little faces as she closed her eyes. Stress and depression caused various illnesses such as headaches. Because of her illness and her emotional state, she had to stay with James Ella, her mother.

Joyslon and Joyland were building an even closer relationship. They had become more like sisters and best friends instead of a mother-daughter relationship. They shared feelings, laughter, smiles, thoughts, problems, did a lot of girl talk both bad and good.

Kewan was Joyslon[']s little baby boy. He will be missed very much for his laughter, singing with him and teaching him new songs that he loved to do.

Kewan would walk around singing "Jesus Love Me", "I'm climbing up on the Rough Side of the Mountain", and "That Holy Spirit".

You would think, okay, he will be a singer some day, but because of his

slow learning disability and understanding words, he never had the opportunity to express what he wanted to be when he grows up.

I believe what we miss most is how Joyland also kept you laughing. There was never a dull moment. She would say funny things or do something not trying to be funny which would be [sic] a smile to your face.

Joyland was a good mother to be as young as she was. She was always there to help you. She was willing to share what she felt or had with those that she loved and trusted.

If she didn't know you she would try and say something nice. Joyland was setting some goals in her life to go back to school to enhance her knowledge with Kewan's learning disability.

She wanted to prepare Kewan for the public school system while making a better life for her and Kewan. Kewan will be missed for his singing that everyone which I feel he had – is how he expressed himself.

We miss his little feet running through the house and his laughter. We miss Kewan when he spent the weekend with James Ella. Kewan would always race her to bed and try to beat her by getting in bed first.

We miss hearing his laughter when he one [sic]. Joyslon and Kewan had a song they would sing together. Joyslon would lead and Kewan would be the background singer. Kewan would be singing "That Holy Spirit All In My Feet". He would touch different items in the apartment and say "that holy spirit in this chair" as an example.

Each family member will all have very special memories of Joyland and Kewan that will never be forgotten.

Id. at 913-17.

Young argues that this victim impact testimony "was not properly restricted to financial, emotional, psychological, and physical effects on the surviving family members." Aplt. Br. at 49. Instead, he notes, it included "[r]eferences to conversations, hyms [sic] sung by the victim [Kewan], and the victim's future goals," none of which "were . . . authorized by statute or constitutionally admissible." Id. Young argues that these references were "designed to elicit, and likely did elicit, a strong emotional reaction in the jury and introduced the spectra [sic] of arbitrariness" in the jury's second-stage

12

verdict.  Id.  Young also complains about the references to Lavada Grant having a heart attack and dying shortly after learning of the murders.  Young argues that this "[e]vidence [suggesting] that [he] caused a third death could be viewed as nothing but aggravation, particularly in the absence of any instructional guidance . . . ."  Id. at 50.

*a) Clearly established federal law*

Young identifies Payne v. Tennessee, 501 U.S. 808 (1991), as providing the "clearly established federal law" applicable to this claim.  See Aplt. Br. at 49.  In Payne, the Supreme Court clarified the scope of admissible victim impact evidence during the sentencing phase of a capital trial.  More specifically, the Supreme Court overruled its prior precedent and held that it was constitutionally permissible for a state to "conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant," including evidence of how "the victim [wa]s an individual whose death represent[ed] a unique loss to society and in particular to his family."  501 U.S. at 825 (internal quotation marks omitted).  In other words, the Court held, "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed."  Id. at 827; see also id. at 830 ("A State may decide . . . that the jury should see a quick glimpse of the life petitioner chose to extinguish, . . . to remind the jury that the person whose life was taken was a unique human being.") (internal citation and quotation marks omitted) (O'Connor, J.,

13

concurring). "In the majority of cases," the Court held, "victim impact evidence [thus] serves entirely legitimate purposes." Id. at 825. Notwithstanding this holding, however, the Court acknowledged the possibility that victim impact evidence could be "so unduly prejudicial that it renders the trial fundamentally unfair . . . ." Id. In such instances, the Court held, "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." Id.

*b) OCCA's rejection of Young's Payne-based arguments*

Young argued in his direct appeal, citing Payne, that the prosecution's use of Morgan's victim impact statement violated his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Young Direct Appeal Br. at 77. The OCCA rejected Young's arguments, stating as follows:

> Trial counsel objected to the introduction of the statement on the grounds it was unconstitutional, more prejudicial than probative and a denial of due process. . . .

> Title 21 O.S.Supp.1995, § 701.10(C) provides the State may present evidence "about the victim and about the impact of the murder on the family of the victim." This evidence is subject to the limitations imposed by the Oklahoma Evidence Code as well as the state and federal constitutions. [citation omitted]. Young argues the statement in his case went beyond these parameters. We have examined the victim impact statement delivered at Young's trial and find it to be squarely within the confines articulated by this Court and the Oklahoma Legislature. The statement explained succinctly the relationships enjoyed by family members with the victims. The statement focused on the effect of the murders on the family of the victims. This is permissible under § 701.10(C).

> Young objects to that part of the statement which included the fact an aunt of the deceased, upon hearing of the murders, suffered a heart attack and died. He argues a causal connection was not proven. This argument is

14

appropriate for trial, not appeal. The presenter of a victim impact statement is subject to cross-examination, and this issue properly could have been plumbed at trial. [citation omitted].

Young I, 992 P.2d at 341-42 (internal paragraph numbers omitted).

*c) Applying the AEDPA standards to the OCCA's analysis*

In this federal habeas appeal, Young does not challenge the OCCA's analysis in terms of the AEDPA standards of review. Indeed, he makes no mention at all of the OCCA's analysis. Instead, he simply repeats, in summary fashion, the arguments he made on direct appeal. Out of an abundance of caution, we will assume that Young is implying by his arguments that the OCCA unreasonably applied Payne in rejecting his constitutional challenge to the admission of the victim impact statement.

After carefully examining the record on appeal, we conclude that the OCCA's rejection of Young's constitutional challenge to the victim impact statement was neither contrary to, nor an unreasonable application of, Payne. To be sure, the OCCA did not cite directly to Payne. It did, however, cite its own decision in Toles v. State, 947 P.2d 180, 189 (Okla. Crim. App. 1997), which in turn acknowledged and applied Payne. As for the specific components of the victim impact statement challenged by Young, the references to conversations that Joyland had with her mother, her future goals, and Kewan's love of singing hymns simply provided a "quick glimpse" into the lives of the two people that Young murdered, and thus did not violate Young's due process rights. Payne, 501 U.S. at 830 (O'Connor, J., concurring). The only other specific part of the statement challenged by Young, i.e., the portion that referred to Lavada Grant, an aunt of the two victims,

15

having a heart attack and dying after she learned about the murders, fell within the scope of Payne's holding allowing the admission of evidence "about the impact of the murder[s] on the victim[s'] family . . . ." Id. at 827. Although Young complains that this portion of the statement implied he was responsible for a third death, we note, as did the OCCA, that his trial counsel made no attempt to cross-examine Morgan on this point. More importantly, having reviewed the entirety of the trial transcript, we are not persuaded that, even in the absence of such cross-examination, this challenged evidence was "so unduly prejudicial that it render[ed] the trial fundamentally unfair . . . ." Id. at 825.

In sum, we conclude Young has failed to establish his entitlement to federal habeas relief on the basis of the admission of the victim impact statement.

*Ineffective assistance of trial counsel*

Young next contends that his trial counsel was constitutionally ineffective for failing to adequately investigate available mitigating evidence and present that evidence during the second-stage proceedings. In support of this contention, Young notes that "[n]o social history investigation was performed; no psychiatric or psychological testing was done; no medical examinations were conducted; [and] almost no argument was made to the jury to spare [his] life." Aplt. Br. at 18. He further notes that "[f]amily members and known friends were not interviewed and prepared to testify by explaining the need and importance of their testimony." Id. at 18-19. He argues that defense counsel's failure prejudiced him "by ensuring that the jury had no evidence to weigh against the aggravating factors or to use to show mercy." Id. at 19.

16

*a) Clearly established federal law*

The "clearly established federal law" applicable to this claim is the Supreme

Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In <u>Strickland</u>, the

Supreme Court held that "[a] convicted defendant's claim that counsel's assistance was so

defective as to require reversal of a conviction or death sentence has two components."

466 U.S. at 687. "First," the Court noted, "the defendant must show that counsel's

performance was deficient." <u>Id.</u> "This requires showing that counsel made errors so

serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the

Sixth Amendment." <u>Id.</u> "Second," the Court noted, "the defendant must show that the

deficient performance prejudiced the defense." <u>Id.</u> "This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is

reliable." <u>Id.</u> "Unless a defendant makes both showings," the Court held, "it cannot be

said that the conviction or death sentence resulted from a breakdown in the adversary

process that renders the result unreliable." <u>Id.</u>

*b) OCCA's rejection of Young's claim*

Young first raised the issue of ineffective assistance of trial counsel on direct

appeal. The OCCA summarily rejected Young's claim:

> As his fourth allegation of ineffective assistance of counsel, Young
> argues trial counsel failed to investigate mitigating evidence. This issue is
> not supported by the record. The record indicates counsel was prepared to
> call seven witnesses in mitigation.

<u>Young I</u>, 992 P.2d at 347 (internal paragraph number omitted). The OCCA also

17

summarily rejected Young's related factual assertion that he waived the presentation of

mitigation evidence[5]:

> Young did not waive mitigation, but opted to introduce it through
> stipulation.  As the State cogently argues, the State had given notice of
> damaging rebuttal evidence, and Young's stipulation strategically avoided
> this risk as well as the risk of cross-examination.

Id. at 341 (internal paragraph number omitted).

After the OCCA denied his direct appeal, Young filed a petition for rehearing

asserting that the OCCA failed to consider his request for an evidentiary hearing in

connection with his ineffective assistance claim.  The OCCA granted Young's petition for

rehearing and, on the merits, denied his request for an evidentiary hearing:

> In support of his application for a[n] [evidentiary] hearing, Young offers
> several affidavits and a transcription of an interview with trial counsel.
> Some of the affidavits are from family members and friends who stated that
> they were willing to testify at trial, but were never contacted to testify.
> Other affidavits are from purported experts in the field of human behavior,
> capital murder cases and mitigating evidence [Linda Palmer, the licensed
> professional counselor who Young's counsel originally sought permission
> from the state trial court to evaluate Young, and Dr. Ann Taylor, a
> psychologist who had functioned as an expert mitigation witness in other
> death penalty cases].  The mitigating evidence contained in the affidavits
> show that witnesses would have testified that Young was a loving father
> and a nice person; that Young was discharged from the Army because he
> was determined to be mentally unfit; that Young had lost a brother and son
> to sickle cell anemia; and that Young still lived with his domineering
> mother.  The interview with trial counsel shows that both Young and his
> mother indicated that they did not want family and friends called to present
> mitigating evidence.

---

[5] Young made this factual assertion in connection with an argument on direct
appeal that the state trial court failed to ensure that he intelligently and knowingly waived
his constitutional right to present mitigation evidence.

The trial record revealed that trial counsel negotiated a stipulation regarding mitigation. Therefore, Young did not waive mitigation. (citation omitted). This stipulation contained a statement that Young's family and relatives love him; Young has been a minister for eleven years; and that Young is a[n] honorably discharged veteran of the Army. In our Opinion we concluded that this stipulation strategically avoided the risk of damaging rebuttal evidence and the risk of cross-examination. (citation omitted).

Upon review of the application and the supporting affidavits and evidence, we find [Young] has shown this Court that trial counsel could well have utilized this evidence and that it may have been prudent for him to do so. However, Young has not shown by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize or identify this evidence. Accordingly, we decline to grant [Young]'s application for an evidentiary hearing. (citation omitted).

Young v. State, No. F 95-1142 at 2-4 (Okla. Crim. App. Feb. 19, 1999) (Order Granting Rehearing and Denying Relief).

Young reurged his ineffective assistance of trial counsel claim in his application for state post-conviction relief, but argued for the first time that his trial counsel should have investigated and presented testimony from "mitigation expert" Dr. Wanda Draper and psychologist Dr. Philip Murphy. The OCCA rejected the claim as procedurally barred:

Young argues he was denied effective assistance of trial . . . counsel regarding the issue of the presentation of mitigation evidence. After reviewing the record, we find Young's ineffective assistance of trial counsel claims do not turn on facts or information unavailable at the time of his direct appeal. Consequently, Young has not met the prerequisites for review of this claim on the merits. This claim is barred.

Young II at 3 (internal citations omitted).

19

*c) The district court's analysis*

In reviewing Young's ineffective assistance claim in the federal habeas context, the district court rejected respondent's argument that Young had procedurally defaulted the portions of his ineffective assistance claim that were raised for the first time in his application for post-conviction relief. Although the district court conceded "that the OCCA's procedural bar based on [Young]'s failure to raise the claim in a direct appeal [wa]s an 'independent' state ground," ROA, Doc. 58 at 18, it concluded "that the procedural bar imposed by the OCCA . . . was not adequate to preclude federal habeas review." Id. at 19. More specifically, the district court noted "that the resolution of [Young]'s allegations concerning trial counsel's failure to investigate psychological evidence and present expert mitigation witnesses [Draper and Murphy] [wa]s not apparent from the trial record," and thus could not have been raised by Young on direct appeal. Id. at 20.

As for the OCCA's rejection of Young's claim on direct appeal, the district court concluded that the OCCA failed to properly apply the second prong of the Strickland test. Id. at 17. In particular, the district court concluded that the OCCA erroneously "required [Young] to show by 'clear and convincing evidence' that he was prejudiced by [trial] counsel's failure to utilize available mitigation evidence." Id.

The district court then proceeded to conduct its own de novo review of Young's ineffective assistance claim. In analyzing the first prong of the Strickland test, the district court concluded "there [wa]s little doubt that [Young]'s trial attorney stopped short of

20

making a reasonable investigation for purposes of uncovering relevant mitigating evidence that could have been useful in (1) fully informing [Young] of all available mitigating evidence and his opinion of its potential effectiveness; and (2) persuading the jury that [Young]'s moral culpability was not sufficient to warrant the death penalty." Id. at 22. In other words, the district court concluded that trial counsel's "failure to adequately investigate mitigation evidence and present it to the jury constituted deficient performance under the first prong of the Strickland test." Id. at 23.

Turning to the second prong of the Strickland test, the district court concluded, after considering the strength of the prosecution's case, the number of aggravating circumstances found by the jury to exist, the mitigating evidence actually presented by Young's trial counsel, and the available mitigating evidence cited by Young in support of his habeas petition, that Young was not prejudiced by trial counsel's failure. Id. at 28. In reaching this conclusion, the district court acknowledged that the mitigation evidence cited by Young "would have shown favorable aspects of [his] character and provided insight into his upbringing and grief related to deaths in his family . . . ." Id. at 27. However, the district court concluded there was not a "reasonable probability that its introduction would have caused the jury to decline to impose the death penalty." Id. In particular, the district court concluded that the fact that Young's mitigation witnesses "considered [him] to be a good person would not have supported the notion that the murder of Joyland Morgan was not committed in a heinous, atrocious or cruel manner" or "negated or affected in any way the fact that [he] knowingly created a great risk of death

21

to more than one person." Id. at 27-28. Lastly, the district court concluded that "the opinions offered by Dr. Draper" would not have caused the jury to "spare[] Young the death penalty had [Draper] been allowed to testify." Id. at 28.

*d) Standard of review on appeal*

Before turning to the specific arguments raised by Young in his appeal, we note our agreement with the district court that we must apply de novo review in evaluating Young's ineffective assistance claim. To be sure, the OCCA purported to address Young's ineffective assistance claim on the merits when it affirmed his convictions and sentences on direct appeal. But it is clear from the record on appeal that it did so on the basis of a limited factual record; in particular, the OCCA did not consider the available mitigating evidence cited by Young in support of his request for an evidentiary hearing on his ineffective assistance claim. When Young subsequently petitioned the OCCA for a rehearing, the OCCA proceeded to examine the mitigating evidence cited by Young, but it viewed that evidence solely in terms of whether Young had satisfied the standard outlined in OCCA Rule 3.11(B)(3)(b)(i), i.e., whether Young had presented "clear and convincing evidence" establishing "there [wa]s a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence."[6] Okla. Stat. tit.

---

[6] Although the district court concluded that the OCCA erroneously "required [Young] to show by 'clear and convincing evidence' that he was prejudiced by counsel's failure to utilize available mitigation evidence," ROA, Doc. 58 at 17, we agree with respondent that the OCCA was instead determining merely whether Young was entitled to an evidentiary hearing pursuant to OCCA Rule 3.11(B)(3)(b) on his ineffective assistance claim. At no point, as far as we can determine, did the OCCA actually apply

(continued...)

22

22, ch. 18, App. Rule 3.11(B)(3)(b)(i). As a result, "we cannot conclude" that the OCCA "necessarily decided that," "the [Strickland] standard was not satisfied" when the OCCA considered the mitigating evidence cited by Young with his request for an evidentiary hearing and denied Young's request for an evidentiary hearing.[7] Wilson v. Sirmons, 536 F.3d 1064, 1081 (10th Cir. 2008).

We also note that the OCCA refused to consider the affidavits from Drs. Draper and Murphy that were obtained and submitted by Young in connection with his application for post-conviction relief. In doing so, the OCCA concluded that Young's ineffective assistance claim "d[id] not turn on facts or information unavailable at the time of his direct appeal," and was therefore procedurally barred. Young II at 3. We have, however, repeatedly questioned whether this Oklahoma procedural rule, requiring ineffective assistance of counsel claims to generally be brought on direct appeal, "can be deemed adequate and independent to bar habeas review." Cummings v. Sirmons, 506 F.3d 1211, 1224 (10th Cir. 2007) (internal quotation marks omitted). We have thus, in turn, "held that th[is] Oklahoma procedural bar will apply [only] in those limited cases meeting the following two conditions: trial and appellate counsel differ; and the

_____

[6](...continued)
the Strickland standard in light of the additional mitigation evidence presented by Young in connection with his request for an evidentiary hearing.

[7] Even if we were to assume otherwise, we would still apply a de novo standard of review to Young's Strickland claim due to the OCCA's failure to consider the mitigating evidence presented by Young in his application for post-conviction relief (i.e., the affidavits of Drs. Draper and Murphy).

23

ineffectiveness claim can be resolved upon the trial record alone." Id. (internal quotation marks omitted). "All other ineffective assistance claims, we have held, are procedurally barred only if Oklahoma's special appellate remand rule for ineffectiveness claims is adequately and evenhandedly applied." Id. (internal quotation marks omitted).

Young's case does not fall within the limited subset of cases subject to procedural bar because, even though his trial and appellate counsel differed, his ineffectiveness claim was clearly incapable of being resolved on direct appeal based upon the trial record alone. Nor, we note, would the granting of an evidentiary hearing by the OCCA on direct appeal have produced the evidence now proffered from Drs. Draper and Murphy. Lastly, we are not persuaded that, as of the time Young's direct appeal was decided, Oklahoma's special appellate remand rule for ineffectiveness assistance claims was adequately and evenhandedly applied. See id. (noting that "Oklahoma rarely, if ever, remands cases for such a hearing") (internal quotation marks omitted).

*e) Young's arguments on appeal*

In his federal habeas appeal, Young argues that the district court was correct in concluding "that trial counsel's performance was . . . constitutionally deficient," but erred in concluding that "Young had not demonstrated prejudice." Aplt. Br. at 22. For the reasons outlined below, however, we conclude the district court was correct in its analysis of both prongs of the Strickland test.

*1. Trial counsel's deficient performance*

"In assessing [defense] counsel's investigation" of available mitigating evidence in

24

a capital case, a federal habeas court "must conduct an objective review of [defense counsel's] performance, measured for 'reasonableness under prevailing professional norms . . . .'" Wiggins v. Smith, 539 U.S. 522, 523 (2003) (quoting Strickland, 466 U.S. at 688). Those prevailing professional norms, according to the Supreme Court, include the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (ABA Guidelines). Id. at 524. Under the ABA Guidelines, "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" Id. (quoting 1989 version of ABA Guidelines). Among the topics defense counsel should investigate and consider presenting include medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experiences, and religious and cultural influences. Id. (citing 1989 version of ABA Guidelines).

In this case, Young submitted, in connection with his direct appeal and request for evidentiary hearing, a transcript of a tape-recorded interview that his appellate counsel conducted with his lead trial counsel, Jim Fransein. In that interview, Fransein stated that he had "briefly" "talked with a couple" of the proposed second-stage mitigation witnesses prior to trial, but that his plan had been to interview each of the mitigation witnesses in somewhat greater depth immediately prior to the start of the second-stage proceedings. ROA, Vol. II, Doc. 23, Exh. 3 at 12. Fransein stated that his plan was derailed, however, when he was informed by Young's mother on the morning of the start of the second-stage

proceedings that she had sent all of the mitigation witnesses home. When asked about the possibility of presenting expert psychological witnesses during the second-stage proceedings, Fransein counsel stated that he had considered obtaining such testimony, but that Young's family was either unable or unwilling to pay for such services, and he believed the trial judge "probably would [have] denied" an application for funding for such services. Id. at 5. Fransein further stated that he had not ordered or obtained any relevant records regarding Young. Lastly, Fransein stated that he and Young had not talked about mitigation evidence or strategy because, "quite frankly," Young was convinced "there was no way that [the jury was] going to find [him] guilty" during the first-stage proceedings. Id. at 12.

We conclude, as did the OCCA and the district court, that the investigatory efforts of Young's trial counsel fell far short of the prevailing standards for capital defense work outlined by the Supreme Court in Wiggins. As the interview transcript makes clear, Young's trial counsel engaged in almost no efforts to investigate and develop mitigating evidence. At best, the transcript indicates that trial counsel spoke briefly with a few unnamed individuals who were presumably Young's friends or family members. As a result, Young's trial counsel completed the first-stage proceedings and began the second-stage proceedings generally unfamiliar with nearly all of the potential sources of mitigating evidence from Young's background. In turn, it is not surprising that trial counsel's second-stage "strategy" focused simplistically on highlighting "the good things that [Young] ha[d] done" in the past and the "belief[s]" of Young's friends and family

26

members "that he [wa]s not a future danger to the community . . . ." State Court ROA, Vol. I at 85. In short, Young's trial counsel did not "fulfill [his] obligation to conduct a thorough investigation of [Young]'s background." Williams v. Taylor, 529 U.S. 362, 396 (2000).

## 2. Prejudice

That leads us to the second prong of the Strickland test, i.e., whether Young was prejudiced by his trial counsel's constitutionally deficient investigatory efforts. In conducting our second prong analysis, we must first address the effect, if any, of Young's decision at trial to forego presenting the mitigation witnesses his trial counsel had subpoenaed and instead rely on a written stipulation of mitigation. More specifically, we must determine whether Young's decision in this regard forecloses the possibility of him establishing prejudice.

As to this question, respondent argues that the Supreme Court's recent decision in Schriro v. Landrigan, 127 S.Ct. 1933 (2007), is controlling. In Schriro, the defendant "refused to allow his counsel to present the testimony of his ex-wife and birth mother as mitigating evidence at his sentencing hearing for a felony-murder conviction." Id. at 1934. The defendant "also interrupted as [his] counsel tried to proffer other [mitigating] evidence, and he told the Arizona trial judge he did not wish to present any mitigating evidence and to 'bring on' the death penalty." Id. The defendant was subsequently sentenced to death. In a state post-conviction proceeding, the defendant argued that his trial counsel "was ineffective for failing to conduct further investigation into mitigating

27

circumstances." Id. The Arizona state courts denied that claim, "finding that he had instructed counsel at sentencing not to present any mitigating evidence at all." Id. The defendant then filed a federal habeas petition, reurging his ineffective assistance claim. Although the district court denied relief, the Ninth Circuit reversed, holding that the defendant was entitled to an evidentiary hearing "because he raised a 'colorable claim' that his counsel's performance" was constitutionally deficient. Id. at 1939. In particular, the Ninth Circuit found that defense counsel "did little to prepare for the sentencing aspect of the case," "and that investigation would have revealed a wealth of mitigating evidence, including the family's history of drug and alcohol abuse and propensity for violence." Id. (internal quotation marks omitted). The Ninth Circuit also concluded, citing Wiggins, that the defendant's "apparently last-minute decision" to forego mitigating evidence could not "excuse his counsel's failure to conduct an adequate investigation prior to the sentencing." Id. at 1942 (internal quotation marks omitted).

The Supreme Court granted certiorari and reversed the Ninth Circuit's decision. In doing so, the Court noted that "[n]either Wiggins nor Strickland addresse[d] a situation in which a client interfere[d] with counsel's efforts to present mitigating evidence to a sentencing court," and that, "[i]ndeed, [it] ha[d] never addressed a situation like th[at]" before. Id. Thus, the Court held, "at the time of the Arizona postconviction court's decision, it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish Strickland prejudice based on his counsel's failure to investigate further possible

28

mitigating evidence." Id. Continuing, the Court also emphasized that it "ha[d] never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." Id. Nor, the Court noted, had it ever "required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." Id. at 1943. Lastly, the Court held that, "[e]ven assuming the truth of all the facts [the defendant] sought to prove at the evidentiary hearing, he still could not be granted federal habeas relief because the state courts' factual determination that [he] would not have allowed counsel to present any mitigating evidence at sentencing [wa]s not an unreasonable determination of the facts under § 2254(d)(2) and the mitigating evidence he s[ought] to introduce would not have changed the result." Id. at 1944.

Respondent argues that, like the defendant in Schriro, Young "cannot demonstrate prejudice from trial counsel's failure to investigate, develop and present all of the mitigation evidence he now embraces" because "[i]t is clear [Young] would not have allowed that evidence to be presented under any circumstances." Aplee. Br. at 30. Rather, respondent argues, Young "demanded that the case in mitigation be limited to the stipulation actually presented to the jury." Id.

We reject respondent's arguments and conclude that Young's case is distinguishable from Schriro. Unlike the defendant in Schriro, who waived his right to present mitigating evidence, thereafter refused to allow his counsel to present any type of mitigating evidence on his behalf, and all but asked the trial court to sentence him to death, Young simply chose to forego the presentation of testimony from the handful of

29

friends and family members that his trial counsel had lined up to testify. Further, as the OCCA expressly found, "Young did not waive mitigation, but [rather] opted to introduce it through stipulation." Young I, 992 P.2d at 341. In light of these circumstances, we find it impossible to predict with any degree of certainty what Young would have done had his trial counsel investigated and prepared to present all of the available mitigating evidence that Young now points to. In particular, we do not believe that Young's decision to forego the live testimony of his friends and family members allows us to accurately predict what he would have done had his trial counsel planned to present mitigating testimony from Drs. Draper and Murphy. Thus, we conclude that Young's decision to forego live mitigation witnesses and rely on the written stipulation of mitigating evidence does not prevent him, in the context of these federal habeas proceedings, from establishing prejudice under the second prong of the Strickland test.

Turning directly to the issue of prejudice, Young argues initially "that the inadequacies of his counsel [we]re so severe as to dispense with the need to show prejudice under Strickland." Aplt. Br. at 33. In support of this argument, Young cites to a single case, Rickman v. Bell, 131 F.3d 1150 (6th Cir. 1997). As outlined in greater detail below, however, a review of Rickman reveals that it is factually inapposite.

The state habeas petitioner in Rickman, Ronald Rickman, was charged in Tennessee state court with first-degree murder for his participation in a murder-for-hire scheme that resulted in the rape, abduction, and death of a female victim. Attorney Robert Livingston was appointed by the state trial court to represent Rickman.

30

Livingston conducted an initial interview with Rickman, during which he confirmed that a statement given by Rickman to authorities was true (it is unclear from the <u>Rickman</u> opinion what the nature of the statement was; presumably, it was an admission of guilt). From that point forward, "Livingston assumed that there was no defense to the charge of first-degree murder and failed to conduct any investigation." 131 F.3d at 1157. In particular, "Livingston did not interview any witnesses, conduct any legal research, or obtain and review any records, including those regarding Rickman's employment, education, mental health, social services contacts, military service, or prison experience." <u>Id.</u> "By Livingston's account, he spent a total of sixteen hours preparing for Rickman's trial." <u>Id.</u>

At trial, "Livingston was not content with mere nonfeasance," and instead "embarked on a course of attempting to persuade the jury that his client, although judged legally competent to stand trial, [was], in fact, abnormal and should not be judged as a normal person." <u>Id.</u> (internal quotations marks omitted). In doing so, Livingston "convey[ed] to the jurors an unmistakable personal antagonism toward Rickman, characterized both by attacks on Rickman and by repeatedly eliciting information detrimental to Rickman's interests." <u>Id.</u> at 1158. According to the Sixth Circuit, "Livingston's attacks on Rickman took the form of portraying him as crazed and dangerous." <u>Id.</u>

The Sixth Circuit ultimately concluded, relying primarily on <u>United States v. Cronic</u>, 466 U.S. 648, 659 (1984) ("if counsel entirely fails to subject the prosecution's

31

case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable"), that not only was Livingston's performance constitutionally deficient, but that it was "so egregious as to amount to the virtual or constructive denial of the assistance of counsel, and thus implicate [a] <u>presumption</u> of prejudice . . . ." <u>Id.</u> at 1156. More specifically, the Sixth Circuit concluded that because "Livingston succeeded in presenting a terrifying image of Rickman, and thereby aligned himself with the prosecution against his own client," the prejudice to Rickman was "patently inherent" and thus it could "dispense[] with the necessity of a separate showing of prejudice . . . ."[8] <u>Id.</u> at 1159.

Although Young's counsel was obviously neglectful in his investigation of potential second-stage mitigating evidence, his conduct at trial was substantially different than that of Rickman's counsel. Most notably, a review of the trial transcript confirms that Young's counsel vigorously challenged the prosecution's evidence, particularly during the first-stage proceedings, and in no way "acted with reckless disregard for [Young]'s best interests" or "with the intention to weaken [Young]'s case." <u>United States v. Collins</u>, 430 F.3d 1260, 1265 (10th Cir. 2005). Even during the second-stage proceedings, Young's counsel attempted to present some type of mitigating evidence (in the form of a stipulation) after learning that Young's mother had sent all of the planned

---

[8] Rickman filed his application for federal habeas relief on March 5, 1985, more than a decade prior to the implementation of the AEDPA. Thus, the Sixth Circuit, in affirming the grant of Rickman's request for federal habeas relief, was not bound by AEDPA's deferential standards of review. <u>See</u> <u>Rickman</u>, 131 F.3d at 1153-54 (outlining standards of review).

mitigation witnesses home and, during closing arguments, pleaded for the jury to spare Young's life. In sum, a review of the trial transcript confirms that Young was not subjected to a constructive denial of counsel. Thus, we conclude Young is not entitled to a presumption of prejudice.

Alternatively, Young asserts that he "was indeed prejudiced by his counsels' deficiencies." Aplt. Br. at 34. "In assessing prejudice" in the context presented here, we must "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534. To establish prejudice, Young must demonstrate there is "a reasonable probability that, absent [counsel's] errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

In his effort to establish prejudice, Young points to proposed testimony from family members, friends, and expert witnesses that his trial counsel failed to discover and present. The proposed testimony from each of these witnesses was outlined in affidavits that were originally submitted in connection with Young's application for state post-conviction relief. The following is a summary of each of those affidavits:

> Reverend William Hamilton: Hamilton "did not know [Young] personally," but rather "was acquainted with him because he had preached at [Hamilton's] church on occasion . . . ." ROA, Vol. II, Doc. 23, Exh. 4 at 1. If he had been called as a witness, he "would have been willing to testify that [Young] always seemed like a nice man." Id.

33

T. B. Lockridge: Lockridge "was acquainted with [Young] because he had served as a resident pastor at [Lockridge's] church, preaching on the first and third Sundays of the month." Id., Exh. 5 at 1. If he had been called as a witness, he "would have been willing to testify that . . . there were no problems with [Young] during his time of ministry with [Lockridge's] church." Id.

Cornelius Young II: Cornelius Young II was "the father of Julius Young . . . ." Id., Exh. 6 at 1. He "would have been willing to testify and assist in the investigation of [his] son's life had [he] been asked to." Id. Further, he "would have cooperated fully in order to and persuade jurors to assess a sentence less than death for [his] son Julius." Id. at 2.

Alene Young: Alene Young was "the mother of Julius Young . . . ." Id., Exh. 7 at 1. She "would have testified in [her] son's behalf and would have assisted in any investigation into his life in order to present evidence so that [her] son would not be sentenced to death." Id. She alleges she "had no understanding of mitigation and the ability to present evidence which would move a jury to extend mercy to [her] son." Id. at 2.

Gertrude Deadmon: Deadmon knew Young "when he was a Youth Guidance Specialist . . . for a year or two," and "she remembered him as a person who spoke very intelligently and very well." Id., Exh. 8 at 1. She "was willing to testify that [Young] was an impeccable dresser, was well-mannered, and articulated well." Id.

Dr. Mozelle Lewis: Lewis is "a long-time friend of [Young]'s family and ha[s] known [Young] since he was a child." Id., Exh. 9 at 1. If called as a witness, Lewis "would have been willing to testify that [Young] had a very mild personality, was rather withdrawn, but was a very courteous child who was willing to do what was asked of him." Id. Further, Lewis would have been willing to testify she "always knew [Young] to be a nice gentleman." Id.

Cornelius Young III: Cornelius Young III is "the older brother of Julius . . . Young." Id., Ex. 10 at 1. If called as a witness, he would have testified that he and his brother "suffered and grieved together when [their] younger brother Terry died of sickle cell anemia," id., and that "Terry's death . . . had a devastating effect on [their] family." Id. at 2. He would have further testified that Julius also "lost his young son . . . to sickle cell anemia," which resulted in "another devastating loss to [their] family and particularly for Julius." Id. In addition, he would have testified that "Julius was a good

34

father to his sons," and "took care of [his] mom and dad by doing the lawn work and acting as a handy-man around the[ir] house." Id. Lastly, he would have testified about his childhood memories and how he and Julius "depended on each other and . . . always helped each other out when there was a difficulty." Id.

Derrick Young: Derrick is one of Julius Young's sons. Id., Exh. 11 at 1. If called as a witness, he would have testified that his "mother and father got divorced when [he] was about four or five years old," but that his father remained "an active participant in [his] life . . . especially during the years between the second and eighth grade[s]." Id. at 2. In particular, Derrick would have testified that his "father coached [his] T-Ball team and actively supported [his] interest in sports," but "never pressured [him] in any sport in which [he] participated." Id. Further, Derrick would have testified that his father "was very strict" and "had high expectations about school work and insisted that [they] do good in school." Id. Derrick also would have testified "[t]hat it was [his] Dad who would take [him] out on country roads to teach [him] how to drive and but for that time [he] would not have had the confidence to take [his] driving test to get [his] driver's license." Id. In Derrick's view, his paternal grandmother "made a lot of the decisions in [her] family," and his "Dad usually went along with [those] decisions." Id. at 3. It was also Derrick's view "that [his] Dad's family did not always see the reality of their lives," and attempted to portray themselves as "perfect people always successful which was simply not true." Id. According to Derrick, "[t]wo of the most hurtful times in [their] family that particularly affected [his] Dad were when [his] younger brother Dominque died of sickle cell anemia and [when his] Uncle Terry" also died of the same disease. Id. He remembers his "Dad crying hysterically and screaming at Dominque's funeral," and "grabbing the casket." Id. He "know[s] [his] Dad was [also] crushed over Terry's death." Id. Derrick "believe[s] the person [his] Dad most admired in his life was [his] great, great Grandfather the Reverend McDaniels," and that his "Dad became a minister hoping it would straighten out his life." Id. Lastly, he "believe[s] [his] Dad's life has worth and would have liked to share [his] Dad's humanity with the jury so that they could see the value his [Dad's] life holds for [him]." Id. at 4.

Julius Young, Jr.: Julius Young, Jr. is the second-oldest son of Julius Young. Id., Exh. 12 at 1. If called as a witness, he would have testified that his father "was an active and vital participant in [his] life as [he] was growing up," id., serving as a "cub scout leader in the troop to which [his] brother and [he] belonged," and as coach of the "T-ball team on which [his] brother and [he] played." Id. at 2. According to Julius Jr., he "knew [he]

35

could always go to [his] father to discuss problems and that [his father] would listen carefully and help [him] decide the best course of action." Id. He would have testified that he "share[d] holidays with [his] dad and grandparents in which [they] ate lots of good food and visited with each other," that his "dad would help [him] whenever [he] was in trouble," and "[t]hat [his] Dad would do nice things like get [him] gifts for [his] birthday." Id. He also would have testified that "[w]henever [he] got out of line [his] Dad did not hesitate to discipline [him] and [he] understood it was because [his Dad] cared." Id. According to Julius Jr., "the best times [he] had with [his] Dad were when [they] were fishing," something they did together "on the weekends." Id. He would have testified that "one of [his] most poignant and painful memories . . . is when [his] little brother Dominque died of sickle cell anemia when he was about two years old," and that "[a]t the funeral [his] Dad tried to pick up Dominque's casket and run away with it." Id. at 3. He would also have testified that his "Uncle Terry Young, [his] father's brother, . . . died of sickle cell anemia about two years before [his] father was charged with" the murders in this case. Id. Julius Jr. "feel[s] if [he] had been allowed to testify [he] could have helped the jury to see [his] Dad through [his] eyes as a caring father who tried to do his best for [him], as someone who had suffered terrible losses in his own life, and as a man who became a minister so that he could help other people through their hurts." Id. Finally, Julius Jr. "would have testified that [his] father had never been violent with [him]," "[t]hat his [Dad's] life has worth" and "if [his Dad] were allowed to live he would still be a supportive father," and "[t]hat [his] Dad's life has value." Id.

Lorean Laws: Laws is Young's maternal aunt. Id., Exh. 13 at 1. If called as a witness, Laws would have testified that she "ha[d] known [Young] all of his life and that he ha[d] always been a very gentle person with a good upbringing from a supportive family." Id. She would have further testified that she "had frequent contact with [Young] in the past and kn[e]w him very well," and that she "was shocked with evidence presented at trial of any anger or violence on [his] part because that is not the person [she] kn[e]w." Id. Additionally, she would have testified that Young "ha[d] always had a loving relationship with both of his parents," was "particularly close to his mother," and had "suffered significant losses in his life, including the death of his young son and his brother, Terry, both of whom died of Sickle Cell Anemia." Id. at 2. Lastly, she would have testified that Young "had a strong desire to be successful in life," and "had a zest for life which was best expressed through music." Id.

Richard McDaniel: McDaniel is Young's uncle and has "known [Young]

since he was a child." Id., Ex. 14 at 1. Had he been called as a witness, McDaniel "would have been willing to testify that [Young] was a very mild young man, was never a violent person, and . . . helped out his mother by doing chores like driving and handiwork around the house." Id. He "would have also testified that [he] did not believe [Young] committed the crime in question." Id.

Linda Palmer: Palmer is "a licensed professional counselor with a Master's Degree in Psychology and [was] pending certification as both a Criminal Justice Specialist and Master Addiction Counselor." Id., Ex. 15 at 1. According to Palmer, "during the pendency of . . . Young's capital trial," she "was contacted by defense counsel . . . about doing a psychological on . . . Young." Id. She allegedly "took initial steps and met with . . . Young's family," but was later advised by defense counsel "that the family did not have the funds to pay for [her] services." Id. Had she "been retained [she] was prepared to conduct psychological testing, do a clinical interview with . . . Young, as well as gather a relevant social history in order to present evidence in mitigation of the death penalty and to rebut the aggravating circumstances alleged by the State based upon [her] findings." Id. at 2.

Wanda Draper, Ph.D.: Draper is "a developmental epistemologist" who "hold[s] the position of Clinical Professor, Emeritus, in the Department of Psychiatry and Behavioral Sciences in the College of Medicine at the University of Oklahoma Health Sciences Center." Id., Exh. 17 at 1. Her "work in the field of child development is interdisciplinary, covering psychology, sociology, anthropology, medical psychiatry, and related cultural and behavioral disciplines." Id. Draper "performed a study of the family and personal background of . . . Young at the request of" his post-conviction counsel. Id. at 2. Of note in her study was that "Young was recognized by his family and community as a well-behaved, responsible, and caring individual who made many contributions to the well-being of others." Id. at 5. In particular, "[h]e served as a minister for eleven years prior to his arrest," and "was active in providing help such as replacing roofs and making renovations on church buildings." Id. at 6. In 1990, while he was "employed as a houseman at the Holiday Dome in Tulsa," Young "rescued a mother and her child from the swimming pool where he was cleaning at the time," and then refused to accept a "monetary reward" offered to him by the mother. Id. The study further indicates that "Young suffered cumulative emotional trauma as a result of the loss of four close family members [maternal grandmother and grandfather, brother, and son] during a seven year period in his adulthood" which, in Draper's opinion, caused him "to experience a breakdown of his compulsively ordered life."

Id. at 10. More specifically, Draper opined that "[t]he emotional impact of these losses produced a severe stress and trauma psychologically," and "his thought processes obscured reality and he suppressed his deepest feelings of loss." Id. According to Draper, "[w]hen . . . Young was threatened with another loss, that of rejection by his girlfriend, one could expect that he would experience severe emotional trauma as he began to, again, lose control." Id. That is, "[w]hen he faced losing his most recent emotional connection to his love, Joyslon, it was beyond the scope of his ability to adapt." Id. at 12-13. Thus, Draper opined, "it is conceivable that he acted in concert with a deep subconscious need to protect his ego and thereby move outside the realm of his conscious awareness of moral justice." Id. at 13. "From a neurological perspective, it is [Draper's] opinion that on a conscious level, he would not be aware of what he had done." Id. In Draper's opinion, the murders "could have been the result of distortion in his rational thinking" "set into action by the combination of severe emotional trauma and use of alcohol which dulled the inhibitions." Id. In other words, she "believe[s] it was an act committed by a person under severe emotional stress, most likely unable to fully comprehend the nature of his actions or the consequences of what was taking place." Id. at 13-14.

Philip Murphy, Ph.D.[9]: Murphy is a licensed clinical psychologist in the State of Oklahoma. App. for Post-Conviction Relief, Exh. 6 at 1. Murphy "performed a comprehensive psychological evaluation upon . . . Young . . . on the premises of the Oklahoma State Penitentiary on 5/6/97 during a 4 hour full-contact visit." Id. at 2. Murphy's "[i]ntellectual estimates show that [Young] operates at the low end of normal range of intellectual functioning." Id. According to Murphy, "[t]he most remarkable finding from [Young's] cognitive testing was the difference between his memory of previous events of an emotionally neutral nature and memories of an emotional nature." Id. at 3. "Within the same testing modality, after a two hour delay, [Young] could remember 90% of a 23 item emotionally neutral passage, but zero % of the same length emotionally laden passage." Id. In Murphy's opinion, "[t]he effect is most probably due to the use of extreme repressive defense mechanisms . . . ." Id. With respect to Young's

---

[9] As we have noted, Murphy's affidavit was obtained by Young's state post-conviction counsel and submitted in connection with the application for state post-conviction relief. Curiously, however, Young makes no mention of Murphy's affidavit in his appellate brief, and thus it is unclear if he intended to abandon reliance on it. Out of an abundance of caution, we will consider it in determining whether Young can establish prejudice under the second prong of the Strickland test.

38

personality, Murphy opined that Young "likely had his emotional needs well-met and well-challenged during his childhood formative years, but a more recent event or condition has produced the need for his personality to engage in defensive operations via withdrawal within himself and histrionic devices of a repressive nature." Id. at 4. "Psychological diagnostic trait testing suggests that [Young] suffers from no Axis I psychiatric condition of either a severe or milder type." Id. Young likely does have a "Compulsive Personality Disorder . . . ." Id. at 6. Notably, however, "[t]his type of psychiatric disorder is not typically associated with the commission of homicide." Id. "Other factors found some mild impulsiveness and possible low frustration tolerance but none connected with aggressive intentions." Id. Young "has no significant substance abuse history or sign of it from th[e] evaluation." Id. at 7. In Murphy's opinion, Young "likely would not aggress against any man in any situation," and "[t]herefore a case could have been made that [Young] does not serve a continuing threat [sic] to society and much more strongly in an all male prison society." Id.

In addition to the mitigation evidence that Young's trial counsel failed to discover and present, the record on appeal establishes that Young's trial counsel actually presented the following stipulation of mitigating evidence to the jury during the second-stage proceedings:

> That [Young] is 42 years of age and he has been a life-long resident of Tulsa;
> [Young] has family, relatives that love him;
> [Young] has been a minister in a church for 11 years;
> [Young] is a veteran, having served in the U.S. Army and was honorably discharged.

ROA, Tr., Vol. III at 919.

Having recounted all of the available mitigating evidence, we next consider the evidence in aggravation presented by the prosecution. During the second-stage proceedings, the prosecution was permitted to incorporate by reference all of the first-stage evidence. This included testimony from various police witnesses describing the

39

crime scene, as well as testimony from the Oklahoma State Medical Examiner describing

the injuries suffered by Joyland and Kewan and the manner of their deaths.  In addition to

the incorporated first-stage evidence, the prosecution presented the testimony of

Catherine Morgan, who, as we have discussed, read into the record a victim impact

statement she had prepared.  Lastly, the state court records indicate that at the conclusion

of the first-stage proceedings, the prosecution filed a notice of intent stating that, in the

event Young offered mitigating evidence, it intended to offer testimony from the

following witnesses in rebuttal of Young's mitigating evidence:

> Joyslon Edwards:  The prosecution's notice stated that Edwards would
> testify "that during March or April of 1993 . . . Young . . . attempted to
> force his way into Apartment #5, 115 East 16th St., Tulsa, OK after
> previously being denied entry and after being informed that she did not
> wish to speak with him."  State Court ROA, Vol. III at 435.
>
> Dedra Morgan, Joyslon Edwards, or Jerry Griggs: According to the
> prosecution's notice, these witnesses[10] would "testify to statements made by
> Joyland Morgan prior to her death regarding the nature of her relationship
> with [Young]."  Id. at 435-36.  In particular, the prosecution's notice stated
> that these witnesses would "testify to allegations made by Joyland Morgan
> regarding sexual contact between [Young] and Joyland Morgan."  Id. at
> 436.
>
> Pam Floyd:  The prosecution's notice stated that Floyd "w[ould] testify to
> an attack by [Young] in 1981 on her automobile after she refused to have
> sex with him.  The existence, location, and specific information to be
> provided by this witness was not discovered until after the [first stage
> proceedings had] commenced."  Id.
>
> Before proceeding to "reweigh the evidence in aggravation against the totality of

_____

[10] The prosecution's notice erroneously listed Joyslon Edwards as "Joyslon
Morgan."  State Court ROA, Vol. III at 435.

40

available mitigating evidence," <u>Wiggins</u>, 539 U.S. at 534, we pause briefly to highlight the jury's second-stage findings and the OCCA's subsequent treatment of those findings. The jury, at the conclusion of the second-stage proceedings, found the existence of three aggravating circumstances: (1) that Young knowingly created a great risk of death to more than one person; (2) the murder was especially heinous, atrocious or cruel; and (3) the existence of a probability that Young would commit criminal acts of violence that would constitute a continuing threat to society. On direct appeal, the OCCA concluded that the jury's verdict form "[wa]s subject to only one reasonable interpretation: the jury found these three aggravating circumstances for each murder Count." <u>Young I</u>, 992 P.2d at 343. The OCCA further concluded that this constituted plain error because the prosecution "was permitted to charge and present evidence to support the 'heinous, atrocious or cruel' aggravating circumstance as to Count II [the murder of Kewan], even though no notice had been given to the defense." <u>Id.</u> at 344. "To remedy this error," the OCCA struck "the 'heinous, atrocious or cruel' aggravating circumstance from Count II" and "reweigh[ed] the aggravating and mitigating evidence as to this Count . . . ." <u>Id.</u> The OCCA also concluded that the evidence presented at trial was insufficient to support the continuing threat aggravating circumstance. <u>Id.</u> Citing one of its prior decisions holding "that in order to prove continuing threat the State must present evidence concerning prior convictions or unadjudicated crimes to show a pattern of criminal conduct that will likely continue in the future," the OCCA noted that "the only evidence introduced of [Young's] past bad acts was five counts of uttering a forged instrument, and the fact Young became

41

'snappy' and had an 'attitude' when he drank." Id. The OCCA therefore struck the continuing threat aggravator as "invalid." Id. Finally, conducting its own reweighing of the valid aggravating factors and the mitigating evidence, the OCCA found "beyond a reasonable doubt" that, "[h]ad the jury considered only the valid aggravators," it "would have sentenced Young to death in both Counts."[11] Id. at 345.

We now turn directly to the process of reweighing the evidence. In doing so, we readily conclude that none of the available mitigating evidence would have prevented the jury from finding that Young knowingly created a great risk of death to more than one person, or from finding that Joyland's murder was especially heinous, atrocious or cruel. Those aggravating circumstances were clearly established by the prosecution's first-stage evidence, which was incorporated by reference into the second-stage proceedings, and nothing in the available mitigating evidence remotely touches on these two circumstances.

We further conclude that, had all of the available evidence been presented to the jury, not only would the jury have found the existence of the continuing threat aggravator, the OCCA would not have stricken it on direct appeal. To be sure, Dr. Philip Murphy opined in his affidavit that Young was unlikely to commit future violent acts, particularly in an all male prison setting. Thus, Murphy's testimony could arguably have operated to

---

[11] As we have already noted, the OCCA's independent reweighing of the aggravating and mitigating evidence is not entitled to deference on federal habeas review because the OCCA did not take into account all of the mitigating evidence that Young's counsel failed to discover and present at trial.

42

rebut the evidence cited by the prosecution in support of the continuing threat aggravator. That said, however, the state court record indicates that, had Young presented mitigating evidence, including the testimony of Dr. Murphy, the prosecution would have presented rebuttal testimony from three additional witnesses that would have provided additional support for the continuing threat aggravator. That evidence would have indicated that Young attempted to forcibly enter Joyslon Edwards' apartment in the spring of 1993, made sexual advances towards Joyland Morgan prior to her death, and attacked a woman in 1981 after she refused to have sex with him. Based upon this evidence, the jury could reasonably have found the existence of the continuing threat aggravator and, given the prosecution's proposed rebuttal evidence establishing Young's commission of two prior violent acts, the OCCA would not have stricken the continuing threat aggravator on direct appeal. Moreover, had the jury heard this additional rebuttal evidence, we are persuaded it would have viewed Young in a more negative light than it already did having heard only the evidence of Young's involvement in the two murders. That is, we are persuaded the state's rebuttal evidence would have reduced, if not eliminated, the possibility of the jury concluding that Young's killing of Joyland and Kewan was a one-time event resulting from extreme stress, and would, in turn, have increased the likelihood of the jury concluding that the murders were part of a pattern of violent conduct by Young towards women who rejected his sexual advances.[12]

_____

[12] In contrast to the situation in Williams, where the evidence indicated that the defendant's "violent behavior was a compulsive reaction rather than the product of cold-blooded

(continued...)

43

In sum, we conclude that, even if Young's trial counsel had presented all of the available mitigating evidence now cited by Young, the jury would still have found the existence of at least two, and perhaps three, aggravating circumstances, and in turn would have been required to weigh those aggravating circumstances against any mitigating circumstances it may have found.

That leads to the question of whether the presentation of the available mitigating evidence would have caused the jury to find the existence of one or more mitigating circumstances.[13] Had Young's trial counsel presented all of the mitigating evidence now cited by Young, it is likely that the jury would have found some mitigating circumstances. To begin with, the testimony from Young's family members could have, as argued by Young, "painted a picture of [him] that was [at least somewhat] sympathetic . . . ." Aplt. Br. at 34. In particular, the jury could reasonably have found that Young had a family, including parents, brothers, and sons, that loved and cared for him, and that, in turn, Young loved and cared for his family. Further, the jury could reasonably have found that Young had performed good deeds in his life, both inside and outside his ministry. In addition, the jury could reasonably have found that Young, as an adult, suffered from, and

---

[12](...continued)
premeditation," 529 U.S. at 398, we note the opposite was true in Young's case. Although the evidence indicates that Young's actions were in reaction to Joyslon's efforts to alter the nature of their relationship (as well as possibly in reaction to Joyland's rejection of his sexual advances), the actual murders were clearly not "a compulsive reaction" occurring in the moment, but rather demonstrated a degree of planning on Young's part, and thus could reasonably be described as "the product of cold-blooded premeditation."

[13] We note that the jury in Young's case was not asked to specify whether it found the existence of any mitigating factors.

44

was negatively impacted by, the loss of both his brother and a son to sickle cell anemia. Finally, the jury could also have found that Young attempted to deal with his emotional distress from these losses by self-medicating with alcohol.

Importantly, however, we conclude that none of these potential mitigating circumstances substantially reduce Young's "moral culpability" for the two murders. Williams, 529 U.S. at 398. Indeed, none of these mitigating circumstances are so unusual as to place Young outside the realm of the average person. Relatedly, unlike many capital defendants, Young's childhood appears to have been generally normal and happy (aside from, according to Dr. Draper, the controlling nature of Young's mother), and thus could not reasonably serve to reduce Young's moral culpability. As for Dr. Draper's opinions regarding Young's psychological and emotional attributes, none of those were particularly insightful or persuasive. For example, Dr. Draper opined that the murders were "an act committed by a person under severe emotional distress [presumably from the losses in his life, combined with the possible rejection from Joyslon Edwards]," and Young was "most likely unable to fully comprehend the nature of his actions or the consequences of what was taking place." ROA, Vol. II, Doc. 23, Exh. 17 at 13-14. While this may well be true, the causes of Young's emotional distress were not substantially out of the ordinary. Moreover, Young's reaction to his emotional distress could have been viewed by the jury as a negative factor, i.e., it could have been considered by the jury as making Young a particularly dangerous person, capable of extreme violence in reaction to relatively common life events.

45

Similarly, nothing in Dr. Murphy's affidavit provides a compelling or sympathetic explanation for Young's violent behavior. Indeed, Murphy concluded that Young's "emotional needs [were] well-met and well-challenged during his childhood formative years," and his psychological testing of Young revealed "no Axis I psychiatric condition of either a severe or milder type." App. for Post-Conviction Relief, Exh. 6 at 4. Although Murphy did conclude that Young likely suffers from a "Compulsive Personality Disorder," he noted that "[t]his type of psychiatric disorder is not typically associated with the commission of homicide." Id. at 6.

In sum, we are not persuaded, weighing all of these factors together, that there is a reasonable likelihood that the jury would have reached a different second-stage outcome had it heard all of the available mitigating evidence now cited by Young. Thus, we conclude Young has failed to establish he was prejudiced by his trial counsel's deficient performance, and in turn we conclude he is not entitled to federal habeas relief in the form of a new second-stage proceeding.

*f) The dissenting opinion*

The dissenting opinion in this case suggests that, because "neither the jury, a state court, nor the federal district court ever heard the mitigating evidence that Mr. Young seeks to present," Dissent at 1, we should "remand the case to the district court for an evidentiary hearing on the prejudice component of Mr. Young's ineffective assistance of counsel claim," id. at 9. As we outline below, this suggestion has neither procedural nor substantive support.

46

Young asserted, in Ground Seven of his amended federal habeas petition, that he was entitled to a federal court evidentiary hearing in connection with his ineffective assistance claim. He did not otherwise indicate, however, whether his purpose in seeking such a hearing was to focus on the first Strickland prong, the second Strickland prong, or both. The district court, in its Opinion and Order denying relief, rejected Ground Seven on the merits, stating:

> In his request for relief (Dkt. #22 at 78-80), Petitioner asks for an evidentiary hearing on his ineffective assistance of counsel proposition. As the disposition of Petitioner's habeas corpus petition does not require reference to any materials beyond those that are available and currently before the Court, this Court finds that there is no need for an evidentiary hearing in this case. There are no disputed factual questions remaining that could possibly entitle Petitioner to habeas corpus relief. Petitioner has failed to demonstrate the need for an evidentiary hearing under either 28 U.S.C. 2254(e)(2) or any other governing principle of law. Williams v. Taylor, 529 U.S. 420 (2000). Accordingly, Petitioner's request for an evidentiary hearing is denied.

ROA, Vol. I, Doc. 58 at 48.

After filing his notice of appeal, Young filed an application for COA with the district court. The application asked the district court to issue a COA "on Grounds One [ineffective assistance], a portion of Ground Two [victim impact statement], Ground Five [admission of Young's "fish blood" statement] and Ground Six [cumulative error]." Id., Doc. 63 at 8. Notably, the application did not seek a COA with respect to Ground Seven of the amended habeas petition.

In his appellate brief, Young makes two fleeting references to his request for an evidentiary hearing. First, in outlining the procedural history of his case, Young notes

47

that the district court denied his request for an evidentiary hearing. Aplt. Br. at 6 ("Although Mr. Young had requested an evidentiary hearing on his ineffective assistance of counsel claim, none was granted."). Second, in the "SUMMARY OF THE ARGUMENT" section of his brief, Young states: "An evidentiary hearing, if held, would have conclusively demonstrated that trial counsel failed in all respects to follow ABA guidelines for capital defense work and would have revealed powerful evidence that Mr. Young could have used to convince a jury that the state had not met its burden to show that aggravating circumstances outweighed mitigating circumstances, or in the alternative, to show mercy despite its verdict on the weighing decision." Id. at 19. The remainder of Young's brief is silent with respect to the evidentiary hearing issue. In particular, Young offers no reasons why, in his view, the district court abused its discretion in rejecting his request for an evidentiary hearing, nor does he expressly request a COA with respect to the issue.

Thus, from a procedural standpoint, the issue of whether the district court abused its discretion in denying Young's request for an evidentiary hearing in connection with his ineffective assistance claim is not properly before us. No COA has been requested or granted on this issue.

Even if we were, as the dissent essentially proposes, to ignore Young's failure to be granted, or to even request, a COA, there are a host of reasons why the dissent's proposal for an evidentiary hearing should not be adopted. To begin with, the dissent mistakenly asserts "that the proper standard for assessing Mr. Young's claims of

48

prejudice is whether 'his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief.'" Dissent at 3 (quoting Bland v. Sirmons, 459 F.3d 999, 1033 (10th Cir. 2006)). The problem with this assertion is that it conflates the pre-AEDPA standard that we apply "when 'a habeas petitioner has diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so,'" Bland, 459 F.3d at 1033 (quoting Miller v. Champion, 161 F.3d 1249, 1253 (10th Cir. 1998)), with the clearly established Strickland prejudice inquiry. Young is entitled to an evidentiary hearing if "his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." Id. at 1033. But he is only entitled to habeas relief if his allegations establish "a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. Thus, the Bland and Strickland standards work in conjunction with each other. Here, as we have shown, Young's allegations, even assuming them to be true, are insufficient to demonstrate prejudice under Strickland. Therefore the district court was not required to hold a hearing. See Schriro, 127 S.Ct. at 1940.

Relatedly, the dissent is mistaken in suggesting that "the flaw in" the majority's prejudice analysis is our reliance "on information that was never presented from the witness stand," including not only the prosecution's proposed rebuttal testimony, but also the testimony of Drs. Draper and Murphy. Dissent at 3. By necessity, a claim that counsel was ineffective for failing to investigate and present available mitigating

49

evidence focuses on information that was never presented to or heard by the jury. Nothing in controlling Supreme Court precedent, however, requires presentation of that evidence to a factfinder before the Strickland prejudice inquiry is resolved. To the contrary, the Court in Strickland emphasized that "[i]neffectiveness is not a question of 'basic, primary, or historical fac[t],'" but rather "is a mixed question of law and fact." 466 U.S. at 698 (quoting Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963)). In turn, the Court in Strickland, consistent with its characterization of the issue as a mixed question of law and fact, conducted its own prejudice analysis, as we have done here, by accepting the proffered evidence at face value. See id. at 675 (noting that, in his state collateral proceedings, Strickland "submitted 14 affidavits from friends, neighbors, and relatives," as well as "one psychiatric report and one psychological report"), 678 (noting that the federal district court "held an evidentiary hearing to inquire into trial counsel's efforts," at which Strickland "offered the affidavits and reports he had submitted in the state collateral proceedings," and "also called his trial counsel to testify"), 699-700 (concluding that "[t]he evidence that [Strickland] says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge").

The dissent is also mistaken in implying that our prejudice analysis is dependent in large degree on the "potential testimony of the prosecution's three rebuttal witnesses." Dissent at 2. The fact is that the outcome of our prejudice analysis would be the same even if, in reweighing the evidence, we were to consider only the aggravating evidence

that was actually relied on by the prosecution at trial, i.e., all of the first-stage evidence that detailed the brutal and callous nature of the two murders that Young committed. That first-stage evidence, standing alone, was clearly sufficient to establish the aggravating factors found by the jury and affirmed by the OCCA (i.e., the knowing creation of great risk of death to more than one person, and that Joyland Morgan's murder was committed in a heinous, atrocious or cruel manner), and we are not persuaded that there is a reasonable probability that the presentation of testimony from Drs. Draper and Murphy would have caused the jury to conclude "that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. As for the three rebuttal witnesses proposed by the prosecution, our point in discussing it was simply to highlight the fact that, had Young's trial counsel presented testimony from Drs. Draper and Murphy, the prosecution in turn would have presented additional, highly prejudicial evidence that would likely have supported a finding that Young was a continuing threat.

The limited scope of the dissent's proposed evidentiary hearing is also problematic. According to the dissent, "both Mr. Young and the government" should be allowed "to present evidence regarding the prejudicial effect, if any, of the deficient performance of Mr. Young's trial counsel." Dissent at 1. As we see it, however, that would necessitate allowing the government to put on all of the evidence that was originally presented during the first-stage of Young's trial. More specifically, because such evidence was incorporated by reference during the second-stage proceedings of Young's trial, it was, and remains, relevant to the aggravating factors alleged by the

51

prosecution, and in turn is relevant to the determination of whether Young was prejudiced by his trial counsel's failure to present the mitigating evidence to which he now points. Thus, the proposed evidentiary hearing would, in the end, effectively amount to a new second-stage proceeding, albeit with a judge acting as factfinder, rather than a jury. In other words, in the name of resolving the prejudice component of Young's ineffective assistance claim, we would, in effect, be granting him the exact type of relief that he seeks in these federal habeas proceedings.

It is also apparent that the dissent has failed to carefully consider what its proposed evidentiary hearing would mean for the ultimate resolution of Young's ineffective assistance claim on appeal. Presumably, the dissent would allow the district court to make credibility findings regarding Drs. Draper and Murphy, as well as to the other witnesses presented by Young and the prosecution. In turn, those findings, which would be factual in nature, would presumably be reviewable on appeal only for clear error. In short, the dissent's proposed evidentiary hearing would transform what the Supreme Court has clearly stated is a mixed question of law and fact into a purely factual issue and, in doing so, would improvidently shift to the district court the great weight of the burden of resolving Strickland-based claims such as the one asserted by Young.

Finally, it bears mentioning that if an evidentiary hearing is warranted in this case, then it would presumably be warranted in any habeas proceeding in which a capital defendant asserts his counsel was ineffective for failing to present available mitigating evidence. Nothing in Supreme Court precedent mandates such a result.

52

*Cumulative Error*

Lastly, Young argues that "[b]oth of the errors complained of" in this appeal, "and alternatively each of the errors complained of in the district court petition[,] warrant . . . habeas corpus relief in the form of a new sentencing proceeding." Aplt. Br. at 50-51. Young also offers a third cumulative error theory in support of his request for a new sentencing proceeding, asserting that we should "cumulatively assess the impact of the [trial] errors" found by the OCCA on direct appeal "and grant habeas relief accordingly." Id. at 52. In this regard, Young notes that on direct appeal, the OCCA "determined that the trial court failed to remove two venire members for cause, that misleading statements were contained in the affidavit for probable cause supporting the request for a search warrant, the trial court did not provide the jury with a proper form for finding aggravating circumstances as to each murder count, and the trial court failed to give an instruction limiting the jury's use of victim impact evidence." Id. at 51-52.

"'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" Brown v. Sirmons, 515 F.3d 1072, 1097 (10th Cir. 2008) (quoting United States v. Toles, 297 F.3d 959, 972 (10th Cir. 2002)). Notably, in the federal habeas context, cumulative error analysis applies only to cumulative constitutional errors. See Jackson v. Johnson, 194 F.3d 641, 655 n.59 (5th Cir. 1999) ("The cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they

violated the trial's fundamental fairness.") (emphasis added).

Addressing Young's theories in order, it is clear that cumulative error analysis does not apply to the two substantive issues raised in his federal habeas appeal because only one of those issues, i.e., the ineffective assistance claim, has any merit.  Thus, there is "nothing to cumulate."  Turner v. Quarterman, 481 F.3d 292, 301 (5th Cir. 2007) (internal quotation marks omitted).

Young's second cumulative error theory is unusual in that it relies not only on the two substantive issues upon which a COA were granted, but also upon all of the other issues raised in his federal habeas petition.  Young does not cite to any cases to support this theory, and our own research has not produced any.  In the end, we conclude there is no basis for us to consider that theory because the other issues raised in Young's federal habeas petition were rejected by the district court and neither the district court nor we have granted a COA with respect to those issues.

That leaves Young's final theory, which posits that we must consider the cumulative impact of all the errors recognized by the OCCA on direct appeal.  That theory is even more problematic than the second in that it relies in part on state law issues that were not, and could not provide, a legitimate basis for federal habeas relief, and were thus never raised in Young's federal habeas petition.  We therefore reject this theory without further analysis.

AFFIRMED.

54

07-5130, *Young v. Sirmons*
**HENRY,** Chief Judge, concurring in part and dissenting in part.


I concur fully with the majority's opinion, except for its analysis of the prejudice component of Mr. Young's ineffective assistance of counsel claim. On that claim, my concern is that neither the jury, a state court, nor the federal district court ever heard the mitigating evidence that Mr. Young seeks to present.

In this capital case, we must be mindful of the principle that "sentences of death are 'qualitatively different' from prison sentences," and that, as a result, "[the Supreme Court] has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 117-18 (1982) (O'Connor, J., concurring) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). I would therefore remand the case to the district court for an evidentiary hearing that would allow both Mr. Young and the government to present evidence regarding the prejudicial effect, if any, of the deficient performance of Mr. Young's trial counsel.

In explaining my views, I will begin with my understanding of the majority's analysis and then turn to the standard that I would apply. Finally, I will explain why I believe Mr. Young is entitled to an evidentiary hearing under that standard.

The majority concludes that Mr. Young has failed to establish that his trial counsel's deficient performance prejudiced him. In addition to basing its opinion on "[the] aggravating circumstances . . . clearly established by the prosecution's first-stage

evidence," maj. op. at 42, the majority details the impact of the potential testimony of the prosecution's three rebuttal witnesses. The majority concludes that the testimony of these witnesses could have led the jury "reasonably [to] have found the existence of the continuing threat aggravator," which in turn would have been upheld by the OCCA. Maj. op. at 43. Additionally, in the majority's view, this testimony (which was never presented) "would . . . have increased the likelihood of the jury concluding that the murders were part of a pattern of violent conduct by [Mr.] Young towards women who rejected his sexual advances." *Id.*

Further, the majority concludes that none of the mitigating circumstances invoked by Mr. Young substantially reduce his culpability for the two murders. In the majority's view, these circumstances do not place Mr. Young outside the realm of the average person. Moreover, Dr. Wanda Draper's opinions regarding Mr. Young's psychological and emotional attributes are not "particularly insightful or persuasive." *Id.* at 45. Additionally, "[Mr.] Young's reaction to his emotional distress could have been viewed by the jury as a negative factor, i.e., it could have been considered by the jury as making [Mr.] Young a particularly dangerous person, capable of extreme violence in reaction to relatively common life events." *Id.*

In my view, the flaw in this approach is its reliance on information that was never presented from the witness stand. What we know of the prosecution's rebuttal witnesses comes from a pleading filed by the prosecutor that merely summarizes anticipated testimony, while, as to Mr. Young's mitigation witnesses, we have only affidavits.

2

Moreover, the lack of a well-developed factual record cannot be imputed to Mr. Young. Instead, it was Mr. Young's counsel's deficient performance that kept the mitigation evidence from the jury. And in the state post-conviction and federal habeas proceedings, the courts denied Mr. Young's requests for an evidentiary hearing.

As a result, I believe that the proper standard for assessing Mr. Young's claims of prejudice is whether "his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." *Bland v. Sirmons*, 459 F.3d 999, 1033 (10th Cir. 2006) (quoting *Miller v. Champion,* 161 F.3d 1249, 1253 (10th Cir. 1998)). If so, he is entitled to an evidentiary hearing. *Id.* Importantly, I view "the existing factual record" as the evidence presented at trial, which Mr. Young had an opportunity to contest. *See generally Wilson v. Sirmons*, 536 F.3d 1064, 1079 (10th Cir. 2008) (distinguishing between "non-record evidence" and "the trial record" in discussing the standard of review under AEDPA).

"The existing factual record" does *not* include the prosecution's summary of rebuttal witnesses' testimony, on which the majority relies here. That limitation is grounded in the Due Process Clause, which ensures that a defendant is provided with an opportunity to test or rebut the prosecution's evidence before it is used against him, *Simmons v. South Carolina*, 512 U.S. 154, 161 (1994), as well as the Eighth Amendment, which "imposes a heightened standard for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 172 (Souter, J., concurring) (collecting

3

cases) (internal quotation marks omitted).[1]

Here, Mr. Young's allegations are not contravened by the existing factual record and, accepted as true, warrant an evidentiary hearing on his claim for ineffective assistance of counsel. There is no dispute that "the investigatory efforts of [Mr.] Young's trial counsel fell far short of the prevailing standards for capital defense work[,]" thereby establishing the first element of the claim. Maj. op. at 26; *see generally Strickland v. Washington*, 466 U.S. 668, 694 (1984). Indeed, the state's counsel commendably acknowledged at oral argument that "I don't think that there's a reviewing court in the land today that would say there's no deficient performance, even though this is not a case

_____

[1] I acknowledge that Mr. Young's counsel did not ask for a certificate of appealability (coa) as to the district court's denial of his request for an evidentiary hearing. However, his counsel did ask for coa on the rejection of his ineffective assistance of counsel claim and argued, in his opening brief, that "[a]n evidentiary hearing, if held, . . . would have revealed powerful evidence that Mr. Young could have used to convince a jury that the state had not met its burden to show that aggravating circumstances outweighed mitigating circumstances, or in the alternative, to show mercy despite its verdict on the weighing decision." Aplt's Br. at 19.

Accordingly, I believe that this court has discretion to remand the case for an evidentiary hearing on that claim. *See Houston v. Schomig*, 533 F.3d 1076, 1083 n.4 (9th Cir. 2008) ("While the dissent correctly points out that neither party formally requested an evidentiary hearing, Houston raised the need for such a hearing during oral arguments. Moreover, *we have previously remanded for an evidentiary hearing sua sponte 'to assist the court in making an accurate determination.'*" (quoting *Butler v. Curry*, 528 F.3d 624, 651 (9th Cir. 2008) (emphasis supplied)); *see also Mancill v. Hall*, 545 F.3d 935, 939 (11th Cir. Oct. 17, 2008) (ordering supplemental briefing on the issue of whether the district court erred in denying the petitioner's request for an evidentiary hearing, even though the court had granted a coa only on the issue of "[w]hether the district court erred when it denied appellant's ineffective assistance of counsel claims as unexhausted and procedurally defaulted"); *Winfield v. Roper*, 460 F.3d 1026, 1040 (8th Cir. 2006) (observing that the court has "the discretion to expand the certificate of appealability" and that "we exercise that discretion carefully").

where nothing was done."

As to the second element—whether the deficient performance was prejudicial—Mr. Young must demonstrate a "reasonable probability" that counsel's performance prejudiced him, meaning a probability "sufficient to undermine confidence in the outcome." *Id.* That is less than a preponderance of the evidence, for "a defendant need *not* show that counsel's deficient performance more likely than not altered the outcome of the trial." *Id.* at 693 (emphasis supplied).

Based on Mr. Young's affidavits, the jury could have heard Mr. Young's sons state that their father's life still has value to them and that they would visit him in prison. The failure to present similar testimony has been deemed prejudicial. *See, e.g.*, *Williams v. Anderson*, 460 F.3d 789, 805 (6th Cir. 2006) ("In addition to presenting the jury with mitigating evidence, the testimony of Petitioner's family and friends would have humanized Petitioner. Thus, the evidence listed above creates a reasonable probability that one juror would have voted against death."); *Marshall v. Cathel*, 428 F.3d 452, 470 (3d Cir. 2005) ("[N]ot only were Marshall's boys willing to testify, but that the sort of things to which they were prepared to testify [that they loved their father and wanted the jury to spare his life] could have served as powerful mitigation evidence."); *Warner v. State*, 29 P.3d 569, 574-75 & n.10 (Okla. Crim. App. 2001) (finding prejudice where counsel failed to present live testimony from the defendant's mother that "she loves her son very much and that it would be devastating for her if he were sentenced to death"); *cf. Coddington v. State*, 142 P.3d 437, 459 (Okla. Crim. App. 2006) ("The humanizing effect

5

of live testimony in the form of a mother testifying for her son as mitigation evidence in a capital murder trial cannot seriously be disregarded as irrelevant." (collecting cases)).

The jury could also have heard Dr. Wanda Draper explain that emotional trauma due to Mr. Young's overprotective mother, the loss of close relatives due to sickle cell anemia, and the potential loss of his relationship with Joylson combined with alcohol use affected Mr. Young's mental state, making him less culpable. In Dr. Draper's view, Mr. Young's actions "could have been a result of distortion in his rational thinking by way of severe trauma to the limbic system in the midbrain" due to the severe emotional trauma and use of alcohol. Wanda Draper affidavit at 13. Dr. Draper's opinions suggest that Mr. Young's behavior was not the product of cold-blooded premeditation but a compulsive reaction for which he is less culpable.

Like the testimony of family members, this kind of evidence of mental or emotional instability is strong mitigation evidence in capital cases. The Supreme Court has recognized that evidence tending to diminish moral culpability is relevant to determine prejudice, especially evidence "consistent with the view that [the defendant's] violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation." *Williams v. Taylor*, 529 U.S. 362, 398 (2000); *see also Smith v. Mullin*, 379 F.3d 919, 943-44 (10th Cir. 2004) (observing that "[t]he jury . . . never received an explanation for [the defendant's] behavior" and concluding that counsel's deficient performance was prejudicial).

I certainly agree with the majority that Dr. Draper's testimony may be called into

question and that there may well be aspects of Mr. Young's past behavior that could have been introduced to support a continuing threat aggravator. I also believe that the majority correctly emphasizes the brutality of the murders. However, without hearing the mitigating evidence, the jury did not know what to weigh against this brutality: we do not know what turned Mr. Young from a minister into a murderer. *Cf. Hoffman v. Arave*, 236 F.3d 523, 536 (9th Cir. 2001) ("Without the benefit of an evidentiary hearing, it is impossible to evaluate the strength of [the petitioner's] defense at trial and sentencing. Therefore, we cannot conclude as a matter of law that there is no reasonable possibility that offering expert testimony and a thorough history of [the petitioner's] educational, medical, and psychological problems at the time of the murder might have reduced the likelihood that the death penalty would have been imposed."). Accordingly, I would commit these questions to the wisdom of the district court, which would have the important opportunity, which we do not, of hearing witnesses testify under oath at an evidentiary hearing, and which would allow both the Mr. Young and the government the chance to respond to their adversaries' evidence. *See generally Boumediene v. Bush*, 128 S. Ct. 2229, 2270 (2008) (noting that "[f]ederal habeas petitioners long have had the means to supplement the record on review, even in the postconviction habeas setting").

Unlike the majority, I do not think that a remand for an evidentiary hearing would "necessitate [either] allowing the government to put on all the evidence that was originally presented during the first stage of [Mr.] Young's trial" or transform a mixed question of law into a purely factual matter. Maj. op. at 51-52. In particular, as part of its

7

prejudice inquiry, the district court could review the trial court record (as we have), allow the parties to present additional relevant evidence, and then proceed to make both factual findings and legal determinations. *Cf. Smith v. Mullin*, 379 F.3d 919, 935-44 (10th Cir. 2004) (noting that the district court was not convinced by a diagnosis by one of the petitioner's experts and that "we must defer to this credibility determination" but also reviewing the district court's legal conclusion that the petitioner had not established prejudice under *Strickland*). The circumstances warranting a hearing here—clear and admitted deficient performance, a failure to present any mental health testimony, an incorrect application of procedural bar, and psychological evaluations from expert witnesses that were funded by the state but never heard by any factfinder—will not be present in every case alleging that counsel failed to present mitigating evidence.

In summary, at this stage of the proceedings, I believe that, accepting Mr. Young's allegations as true, "the . . . mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Mr. Young's] moral culpability," *Wiggins v. Smith*, 539 U.S. 510, 538 (2003) (internal quotation marks omitted), and the likelihood of a different result if the evidence had been considered is "sufficient to undermine confidence in the outcome" actually reached at sentencing. *Strickland*, 466 U.S. at 694. I would therefore remand the case to the district court for an evidentiary hearing on the prejudice component of Mr. Young's ineffective assistance of counsel claim.